# Exhibit 2

Conway v Petronius Clothing Co Ltd

## Conway and others v Petronius Clothing Co Ltd and others [1978] 1 All ER 185

CHANCERY DIVISION

SLADE J

22, 23, 24, 25 FEBRUARY, 21, 22 MARCH, 19 APRIL 1977

**Company — Director — Right to inspect company's books of account — Nature and extent of director's right of inspection — Statutory or common law right — Absolute or qualified right — Right to obtain order compelling company to make available books for inspection — Discretion of court whether to make order — Likelihood of director being removed from office — Interlocutory application — General meeting having been convened at date of application for purpose of removing director from office — Whether court should make order compelling company to make books of account available to director for inspection — Companies Act 1948, s 147.**

The first defendant ('Petronius'), a private company, was incorporated in 1970. It had three shareholders. The plaintiffs and the fourth defendant were directors of the company. In 1972 the third defendant, O, a chartered accountant, was appointed auditor of Petronius. In the course of his audit for the year ending 31 December 1972 it became clear to him that its affairs were in substantial disorder. He discussed the management of Petronius with one of the shareholders. He said that he would take part in the financial and administrative management of Petronius if he could have absolute control of the board of directors and that he felt that that could be best achieved by transferring the whole of the issued capital of Petronius to a holding company in exchange for shares in that company. Thereafter he instructed his solicitors to acquire a 'shell company' as the proposed holding company. The second defendant ('Manwith'), also a private company, was acquired for that purpose. On 21 May 1973, at a meeting between the shareholders and directors of Petronius and O and his solicitors, arrangements were made, inter alia, for the transfer of the whole of the existing share capital of Petronius to Manwith. New articles of association for Manwith were adopted increasing its share capital and dividing it into ordinary shares and 'A' ordinary shares and giving the holders of the 'A' ordinary shares power to appoint a special director who would have voting supremacy at meetings of the board of directors. Ordinary shares in Manwith were allotted to the plaintiffs who became directors of that company. All the 'A' ordinary shares with special voting rights were allotted to WCN, a company controlled by O, thereby enabling him to control the board of Manwith. Subsequently considerable ill-will developed between the plaintiffs and O. The plaintiffs felt that they had been the victims of a confidence trick on the part of O. According to them it had not been explained to them at the meeting on 21 May that the shares in Manwith which were issued to WCN were not of the same class as the shares issued to everybody else or that such shares would carry the right to appoint a special director who would have a casting vote as chairman of Manwith, and they had had no independent advice on the matter. In 1976 they formed the suspicion that O, who had become the special director of Manwith and a director of Petronius, was misapplying the assets of both companies. The plaintiffs and others, who together held 75 per cent of the issued share capital of Manwith, decided to put Manwith into a members' voluntary liquidation with a view to realising its assets for the benefit of all its members and pursuing against O and his associated companies such remedies as Petronius and Manwith might have

against them. On 18 November they served on Manwith a requisition calling for an extraordinary general meeting to consider a special resolution that Manwith be voluntarily wound up. On that date the plaintiffs, in their capacity as directors, made an attempt to

*[\*186]*

inspect the books of account of Manwith and Petronius. It was unsuccessful. On 22 November they commenced proceedings against the defendants and sought by motion, inter alia, an order to inspect the books of account of Manwith and Petronius so that they could file a declaration of solvency of Manwith and investigate the suspected misapplications of assets of both companies. They filed evidence suggesting that they had strong prima facie grounds for believing that O, by virtue of his control of the management of Petronius, had been manipulating its affairs and milking its profits for his own personal advantage. The defendants filed evidence denying that suggestion and asserting that the primary purpose behind the plaintiff's desire to inspect the books of account was to obtain information as actual or potential competitors of Petronius. The judge ordered that the books of account belonging to Petronius and Manwith should be delivered to a third party for safe custody pending a further hearing of the motion. In the meantime the directors of Petronius resolved to convene an extraordinary general meeting of Petronius, and the directors of Manwith resolved that it would give Petronius notice that it intended to propose resolutions for the removal of the plaintiffs as directors of Petronius at the extraordinary general meeting. The extraordinary general meeting of Petronius was to be held before the extraordinary general meeting of Manwith, so that it was likely that the plaintiffs would be removed from office as directors of Petronius before the meeting at which the resolution for the voluntary winding-up of Manwith was likely to be passed. Both meetings were adjourned until after the resumed hearing of the motion. At the adjourned hearing the defendants did not oppose in principle an order for the production of the books of account of Manwith, but they resisted an order for production being made against Petronius. The plaintiffs contended that s 147(3)[a] of the Companies Act 1948 conferred on the directors of a company a mandatory and unqualified right to inspect the 'books of account' which the company was obliged to keep under s 147(1), and that accordingly, as directors of Petronius, they were entitled to the order sought.

[a] Section 147, so far as material, is set out at p 197 *e f*, post

**Held** – (i) Section 147(3) did not confer on a director a statutory right to inspect the books of account of his company but such a right did exist at common law. That right was to enable a director to carry out his duties as a director and was to be exercised for the benefit of the company. As the right was not statutory, the court had a discretion whether or not to assist a director in enforcing it, but the court would generally assist him unless there was evidence that such a course would be likely to be injurious to the company (see p 201 *c* to *h* and p 202 *a b*, post); Burn v London and South Wales Coal Co and Risca Investment Co (1890) 7 TLR 118 and dictum of Street J in Edman v Ross (1922) 22 SR (NSW) at 361 applied.

(ii) Where, however, an interlocutory application for inspection was made by a director who was alleged to have been misconducting himself as a director and, at the time when the application came before the court, a general meeting of the company had been convened for the purpose of removing him from office, the court would normally intervene to assist him before the wishes of the company had been made known at the general meeting only if it considered such intervention necessary for the protection of the company. The balance of convenience would generally require the postponement of his interlocutory application until the meeting had been held (see p 201 *h* to p 202 *c*, post).

(iii) ●n the evidence the balance of convenience was against making an immediate order for inspection before the general meeting of Petronius was held because (a) there was a triable issue in regard to the defendants' allegations that the plaintiffs were interested as competitors of Petronius and that their motives for seeking an order for inspection were to obtain

Conway and others v Petronius Clothing Co Ltd and others [1978] 1 All ER 185

information as actual or potential competitors of Petronius, (b) it was possible that, if the allegations were well-founded, an immediate order for inspection would cause irremediable damage to Petronius and to the

[*187]

other defendants by virtue of their interests in Petronius or Manwith, and (c) the plaintiffs would not suffer any substantial damage if the order regarding the safe custody of the documents was continued. Accordingly the part of the motion relating to the books of account of Petronius would be adjourned until a reasonable time after the proposed general meetings of Petronius and Manwith and the order relating to the custody of the books would be continued (see p 202 *d* to *j* and p 203 *c* to *f*, post).

Quaere. Whether a director's common law right to inspect a company's books of account is a right incident to his office and independent of contract, or a right dependent on the express or implied terms of his contract of employment with the company, so that it may be excluded by express provision to the contrary (see p 201 *d e*, post).

NotesFor a director's right to inspect books of account, see 7 *Halsbury's Laws* (4th Edn) para 625, and for cases on the right to inspect books and documents, see 9 *Digest* (Reissue) 196, 197, *1187 1193*.
For the Companies Act 1948, s 147, see 5 *Halsbury's Statutes* (3rd Edn) 227.

Cases referred to in judgmentBainbridge v Smith (1889) 41 Ch D 462, 60 LT 879, CA, 9 *Digest* (Reissue) 469, *2790*.
Burn v London and South Wales Coal Co and Risca Investment Co (1890) 7 TLR 118, 9 *Digest* (Reissue) 197, *1190*.
Cutler v Wandsworth Stadium Ltd [1949] 1 All ER 544, [1949] AC 398, [1949] LJR 824, 25 *Digest* (Repl) 504, *582*.
Edman v Ross (1922) 22 SR(NSW) 351, 9 *Digest* (Reissue) 197, * *370*.
Harben v Phillips (1883) 23 Ch D 14, 48 LT 741, CA, 9 *Digest* (Reissue) 466, *2770*.
M'Cusker v M'Rae 1966 SC 253, 9 *Digest* (Reissue) 652, * *1867*.
Mutter v Eastern and Midlands Railway Co (1888) 38 Ch D 92, 57 LJCh 615, 59 LT 117, CA, 10 *Digest* (Reissue) 1378, *8867*.

Cases also citedAmerican Cyanamid Co v Ethicon Ltd [1975] 1 All ER 504, [1975] AC 396, HL.
Featherstone v Cooke, Trade Auxiliary Co v Vickers (1873) LR 16 Eq 298.
Stanfield v Gibbon [1925] WN 11.

MotionBy a writ issued on 22 November 1976, the plaintiffs, (i) Fenton Derek Conway, (ii) Barry Johnson and (iii) Sidney Reece, brought an action against the defendants (i) Petronius Clothing Co Ltd ('Petronius'), (ii) Manwith Investments Ltd ('Manwith'), (iii) Ronald Martin Oppenheimer and (iv) John Edward Grundy. By notice of motion dated 22 November 1976 the plaintiffs sought the following relief, which was in similar terms to that claimed in the writ: (1) an order that the defendants forthwith produce or cause to be produced to the plaintiffs all books of account, management accounts, working papers, bank statements, cheque stubs, contracts, instruments of transfer, and invoices belonging to Petronius and permit the plaintiffs to take copies thereof; (2) an order that the defendants forthwith produce or cause to be produced to the first and second plaintiffs all books of account, management accounts, working papers, bank statements, cheque stubs, contracts, instruments of transfer and invoices belonging to Manwith and permit those plaintiffs to take copies thereof; (3) an order that the defendants deliver or cause to be delivered all such books of account, management accounts, working papers, bank statements, cheque stubs, contracts and invoices to Petronius's and Manwith's solicitors, Messrs Clintons, at their offices at

55  58 Pall Mall, London SW 1, for safe custody until whichever should be the earlier of (a) the trial of the action or further order, and (b) such inspection having taken place and the respective plaintiffs having taken such copies thereof as they might require; (4) the appointment of a receiver and manager of the assets of Petronius

[*188]

pending trial of, or further order in, the action; (5) the appointment of a receiver and manager of the assets of Manwith pending trial of, or further order in, the action; (6) all necessary powers of entry and search. On 24 November Goulding J, by consent, made an order ordering the defendants and each of them forthwith to cause to be delivered up on oath to Messrs Thornton Baker & Co, chartered accountants, all books of account, management accounts, working papers, bank statements, cheque stubs, contracts and invoices relating to any period after 21 May 1973 belonging to either Petronius or Manwith to be held by Messrs Thornton Baker & Co pending the further hearing of the motion or until further order in the meantime, subject to and in accordance with the provisions set out in the schedule to the order, which related to safe custody etc There was a further hearing of the motion on 30 November, when it was adjourned until 17 December on a continuation of the terms embodied in the order of 24 November. On 17 December the motion was stood over on mutual undertakings being given by the parties. The facts are set out in the judgment.

*G B H Dillon QC, David Oliver* and *Richard McCombe* for the plaintiffs.

*J M Chadwick* for the defendants.

Cur adv vult

19 April 1977. The following judgment was delivered.

SLADE J

read the following judgment. This is a motion concerning the affairs of two private companies respectively named Petronius Clothing Co Ltd (which I will call 'Petronius') and Manwith Investments Ltd (which I will call 'Manwith'). The plaintiffs in the action, who are now moving the court, are Mr Fenton Derek Conway, Mr Barry Johnson and Mr Sidney Reece. All these three persons are directors of Petronius. Mr Johnson formally resigned his directorship in June 1974, but appears to have resumed this function shortly afterwards and to have been treated de facto as a director at all material times. Messrs Johnson and Conway are directors of Manwith. Petronius and Manwith are respectively the first and second defendants in the proceedings. The third defendant is Mr Ronald Martin Oppenheimer. The fourth defendant is Mr John Edward Grundy. Mr Oppenheimer and Mr Grundy are both directors of Petronius. Mr Oppenheimer is a director of Manwith. Paragraph (1) of the notice of motion, as amended, seeks an order that the defendants forthwith produce or cause to be produced to the plaintiffs all books of account, management accounts, working papers, bank statements, cheque stubs, contracts, invoices and instruments of transfer belonging to Petronius and do permit the plaintiffs to take copies thereof. Paragraph (2) seeks a similar order against the defendants in favour of Mr Johnson and Mr Conway relating to the books of account etc belonging to Manwith. Paragraph (3) seeks an order that the defendants do deliver or cause to be delivered all such books of account etc to Messrs Clintons, the solicitors of Petronius and Manwith, at their offices for safe custody until whichever shall be the earlier of (a) trial of this action or further order; and (b) such inspection having taken place and the respective plaintiffs having taken such copies thereof as they may require. Paragraph (4) seeks the appointment of a receiver and manager of the assets of

Conway and others v Petronius Clothing Co Ltd and others [1978] 1 All ER 185

Petronius pending trial of or further order in the action. Paragraph (5) seeks the appointment of a receiver and manager of the assets of Manwith during the like period. Paragraph (6) asks for all necessary powers of entry and search. Paragraph (7) seeks an order providing for the costs of the application.

Petronius, which was incorporated in 1970, has at all material times carried on business as an importer and distributor of clothing. Shortly before 21 May 1973 it had had three shareholders only, namely Mr Conway, a Mr Eytan Bick and a Mr David Greenfield, each of whom had held approximately one-third of the issued share capital of the company. The evidence before me indicates that Mr David Greenfield

*[\*189]*

suffered from a mental disability, which made him incapable of understanding and participating in business affairs. His father, Mr Gerald Greenfield, seems broadly to have supervised his interests in Petronius. Mr Oppenheimer, who is a chartered accountant, acted for Mr Gerald Greenfield prior to May 1973 and no doubt from time to time advised him in relation to the affairs of his son. Mr Oppenheimer was also appointed auditor of Petronius in December 1972 and audited its accounts to the year ended 31 December 1972.

According to his evidence, it became clear to him during the course of that audit that the financial and administrative affairs of Petronius were in substantial disorder. According to his evidence, Mr Gerald Greenfield in April 1973 asked him if he would be prepared to take part in the management of Petronius with a view to developing and promoting its business. Mr Oppenheimer says that he eventually agreed with Mr Gerald Greenfield (i) that he would take part in the financial and administrative management of Petronius on the terms that he should have absolute control of the board of directors; (ii) that this could best be achieved by transferring the whole of the issued capital of Petronius to a holding company, in exchange for shares in that holding company; and (iii) that his requirement of financial participation should be satisfied by the allocation of shares in the holding company to a company incorporated in Jersey known as WCN Agencies Ltd. The precise interest of Mr Oppenheimer in the latter company (which I will call 'WCN') is not apparent on the evidence, but since he himself, without stating his interest, states that it is 'likely to act in accordance with his advice', I think it may be assumed that he effectively has control of it.

Mr Gerald Greenfield denies that any such detailed agreement was reached between him and Mr Oppenheimer, although he accepts that they discussed the management of Petronius in general terms and that Mr Oppenheimer told him that he would like an interest in Petronius.

Following these discussions, whatever their precise nature, Mr Oppenheimer instructed his solicitors, Messrs Clintons, to acquire a 'shell company' with suitable memorandum and articles of association to be the proposed holding company and to draw a share exchange agreement. The company acquired for this purpose was Manwith, which had been incorporated on 16 February 1973 and which had an authorised share capital of £100 divided into 100 shares of £1 each, none of which had been issued. Mr Oppenheimer's solicitors, on his instructions, prepared new articles of association for Manwith which provided for the share capital to be increased to £20,000 divided into 180,000 ordinary shares of 10p each and 20,000 'A' ordinary shares of 10p each. They further contained provisions under which the holders of the 'A' ordinary shares should have power to appoint a 'special director' who was to be given voting supremacy at meetings of the board of directors. His idea was that the whole of the 20,000 'A' ordinary shares, being ten per cent of the capital of Manwith, would be held by WCN, that he should be the 'special director' and as such would control the board of directors of Manwith and, through its holding of the whole of the issued share capital of Petronius, the board of directors of Petronius.

After these documents had been prepared, on 21 May 1973 a meeting took place at the home of Mr Oppenheimer in London, which was attended by Mr Conway, Mr Bick, Mr David Greenfield, Mr Gerald Greenfield, Mr Oppenheimer, Mr Cohen (a partner in the firm of Mr ●ppenheimer's solicitors) and also by the plaintiffs Mr Johnson and Mr Reece. Both Mr Reece and Mr Johnson had for some time previously been selling goods for Petronius on a commission basis and, in the discussions between Mr Gerald

Greenfield and Mr Oppenheimer, it had been proposed that they should take some financial interest in Manwith.

At that meeting Mr Oppenheimer produced the engrossment of a share exchange agreement intended to be executed by the shareholders of Petronius of the one part and the shareholders of Manwith of the other part. It was drawn on the basis that the shareholders in Petronius were Mr Bick, Mr Conway and Mr David Greenfield; but Mr Gerald Greenfield stated at the meeting that the shares formerly vested in

*[*190]*

the name of his son, Mr David Greenfield, had become vested in a Jersey company known as Ulula Ltd and the document was amended accordingly in manuscript. It was signed by Mr Bick and Mr Conway at the meeting and was subsequently signed by Lord Louth on behalf of Ulula Ltd; it was also signed by Mr Oppenheimer on behalf of Manwith. As appears from the schedule, Mr Bick, Mr Conway and Ulula Ltd each exchanged their holdings of shares in Petronius for 6,500 ordinary 10p shares in Manwith.

At this meeting new articles of association of Manwith were adopted by a special resolution in the form which had been prepared by Mr Oppenheimer's solicitors. There was also a discussion as to the proportions in which the issued share capital of Manwith should be divided amongst the various interested parties. It was agreed in particular that the 20,000 'A' ordinary shares of Manwith, being ten per cent of the capital to be issued, should be issued to Mr Oppenheimer, according to Mr Conway's evidence, or to WCN, according to Mr Oppenheimer's evidence. A proposal was raised at the meeting that some shares in Manwith should be issued to Mr Brian Long, who it was intended should become an employee of Petronius based in Romania, and Mr Roy James, another employee of Petronius at that time, in addition to the other five intended shareholders.

The effect of the meeting and of the documents signed at it and of various documents signed in the following months was to transfer the whole existing share capital of Petronius to Manwith, to alter the articles of association of Manwith in such manner, inter alia, as to create a special class of 'A' ordinary shares in Manwith with special voting rights, and to result in the issued share capital of Manwith being held as follows:

Conway and others v Petronius Clothing Co Ltd and others [1978] 1 All ER 185

| | | | |
|---|---|---|---|
| Ulula Ltd | 28,332 | ordinary | shares |
| Mr Johnson | 11,000 | ' | ' |
| Mr Reece | 11,000 | ' | ' |
| Mr Conway | 17,334 | ' | ' |
| Mr Bick | 17,334 | ' | ' |
| Mr James | 2,000 | ' | ' |
| WCN | 10,000 | 'A' ordinary shares | |
| Mr Long | 3,000 | ordinary shares | |

Conway and others v Petronius Clothing Co Ltd and others [1978] 1 All ER 185

The amended articles of Manwith, as I have indicated, conferred special rights in respect of the 'A' shares issued to WCN, which resulted in WCN having effective control of any meeting of the board of directors of Manwith.

At all material times until 19 November 1976 Messrs Conway, Johnson and Oppenheimer were the directors of Manwith. On 19 November 1976 there was a purported appointment of Mr Long and Mr Michael Galliver as additional directors, to which I will refer hereafter. At all material times the persons acting as directors of Petronius have been the plaintiffs, the two individual defendants and Mr Long and Mr Galliver. I have already referred to the special position of Mr Johnson in this context.

There is an acute conflict of evidence as to what took place at the meeting of 21 May 1973 and as to the propriety of the transactions initiated at that meeting in relation to Manwith and Petronius. The plaintiffs say, in effect, that they were the victims of a confidence trick on the part of Mr Oppenheimer. They say that it was not explained to them that the shares in Manwith, which were to be issued to WCN, were not of the same class as the other shares obtained by everybody else or that there was any question of such shares carrying special rights to appoint a 'special director', who would inevitably have a casting vote as chairman of Manwith and thus give entrenched control of the board of management to Mr Oppenheimer or his company WCN. They say they did not realise this was the position until long afterwards. They did not have any independent advice in this transaction. They say that they relied on Mr Oppenheimer as their adviser to act in their best interests and, in

[*191]

effect, that he misled them. Mr Oppenheimer and Mr Cohen, on the other hand, utterly deny this. They say in effect that everything was explained by them in great detail to the other parties present at the meeting, who appeared to understand perfectly well what was happening.

There is, however, no claim in this action or on this motion to set aside these arrangements reached in 1973. I therefore do not have to express any view as to the propriety or otherwise of these transactions or as to the part which Mr Oppenheimer took in them and indeed it would be inappropriate to do so on the evidence at present available. The principle relevance for present purposes of the serious allegations made against him by the plaintiffs is, I think, to explain the background of mutual illwill which permeates the whole of these proceedings, and makes it unlikely that the plaintiffs and Mr Oppenheimer will ever again be able to work together in harmony.

Ulula Ltd subsequently changed its name to 'Conesto Investments Ltd' and I will henceforth refer to it as 'Conesto'. At a meeting of the board of directors of Manwith, held on 26 October 1973, a number of transfers of shares in Manwith were approved, including a transfer of 10,000 ordinary shares by Conesto in favour of WCN. It is alleged by the plaintiffs that the circumstances of that transfer call for further investigation. On 20 December 1976 proceedings were instituted by Conesto against WCN and Mr Oppenheimer to have the transfer set aside, but they have not as yet got very far.

As a result of the transfers registered pursuant to the resolution of the directors of 26 October 1973, the share capital of Manwith is held as follows:

Conway and others v Petronius Clothing Co Ltd and others [1978] 1 All ER 185

| | | | |
|---|---|---|---|
| Mr Conway | 15,000 | ordinary | shares |
| Mr Johnson | 15,000 | ' | ' |
| Mr Reece | 10,000 | ' | ' |
| Mr Bick | 15,000 | ' | ' |
| Mr James | 2,000 | ' | ' |
| Conesto | 18,000 | ' | ' |
| Mr Long | 5,000 | ' | ' |
| | 10,000 | ' | ' |
| WCN | plus 10,000 'A' ordinary shares | | |

The first six named of these shareholders, who hold 75 per cent of the issued share capital of Manwith, have formed themselves into a group which is referred to in the evidence as 'the consortium'. The members of the consortium are unanimous in their wish to put Manwith into members' voluntary liquidation. WCN and Mr Long, who hold the remaining 25 per cent of the issued share capital of Manwith, do not wish to see that company liquidated. The members of the consortium, however, have the necessary votes to procure liquidation, subject only to the validity, which is in dispute, of certain proxies given by Mr James in respect of his shares. By a mortgage of 1 November 1976 Mr James purported to charge his shareholding in Manwith as security for the repayment of a sum of £2,500 lent to him by WCN. WCN claims that, according to its terms, the mortgage is not redeemable by Mr James until 1 November 1977 and that he is under a binding contractual obligation during the interim period to exercise all voting rights vested in him in respect of these shares in accordance with WCN's instructions. WCN further relies on a form of proxy signed by Mr James and dated 1 November 1976, under which he purported to appoint Mr Oppenheimer or Mr Long or any officer of WCN as his proxy to vote for him at any general meeting of Manwith held prior to 31 December 1977 and at any adjournment thereof and to direct such proxy to vote or abstain from voting as he saw fit. Mr James, who has offered to redeem the mortgage, claims that it is immediately redeemable and does not accept that the proxy is any longer binding on him or that he is under any obligation to exercise the relevant voting rights in accordance with the instructions of WCN. On 21 December 1976 he instituted proceedings for redemption against WCN.

*[\*192]*

A motion was made by WCN in that action on 6 January 1977 seeking an interlocutory injunction restraining Mr James from exercising any voting rights in respect of his shareholding in Manwith or alternatively from exercising such rights otherwise than in accordance with the instructions of WCN or through Mr Oppenheimer or Mr Long or some officer of WCN in accordance with the terms of the proxy to which I have referred. I shall be delivering my judgment on that motion immediately after this present judgment. I should, however, say now that I do not propose to grant WCN the interlocutory relief which it seeks in this respect. The result of this will be that, subject to any appeal from my judgment on that motion or to any interim arrangements which may be made pending an appeal, Mr James will be free to exercise the votes in respect of his shares in Manwith. Thus in the near future, if the members of the consortium remain unanimous, the liquidation of Manwith is likely to ensue.

The plaintiffs now seek to inspect the books of account and records of Manwith and Petronius, their purpose being, according to the first affidavit sworn by Mr Conway in support of the motion, in order to file a declaration of solvency of Manwith and also to investigate suspected misapplications of assets of both Manwith and Petronius. They have filed a large volume of evidence which, they suggest, shows the strongest prima facie grounds for believing that Mr Oppenheimer, by virtue of his control of the management of Petronius, has been manipulating its affairs and milking its profits for his own personal advantage, particularly in relation to overseas contracts. They suggest that he has been using a company called Hock Seng Ltd, a Hong Kong company said to be controlled by him, as a vehicle for improperly creaming off the profits on the importation of goods by Petronius from Korea. They suggest that he has improperly employed two companies, respectively called Rothschild Tailoring Corpn of Canada and Rothschild Tailoring Corpn of America, to exploit for his own advantage the Canadian and United States market for Petronius goods. They suggest that he has also been improperly obtaining personal profits by means of a company called Hearnweir Ltd, which was set up as an outlet for the retail selling of Petronius clothing. They say that they first learned that serious misapplications of funds of Petronius at the instance of Mr Oppenheimer might have taken place when in January 1976 Mr Conway, in association with Mr Gerald Greenfield and Mr Ronald Harris, a management consultant advising them, obtained copies of various documents belonging to Petronius.

Likewise a large volume of evidence has been filed on behalf of the defendants with a view to refuting these suggestions, which are absolutely denied by them. Mr Oppenheimer in his evidence does not accept

that the primary reason behind the plaintiffs' desire to inspect is a desire for investigation; he submits that their primary purpose is to obtain information as actual or potential competitors of Petronius. He refers to the fact that on 8 January 1976, after Mr Conway, Mr Harris and Mr Gerald Greenfield had come into possession of certain documents belonging to Petronius, Petronius sought and obtained interlocutory relief against them from Tudor Evans J and issued a writ against them the next day. He exhibits a large number of affidavits sworn in support of this application and in relation to subsequent interlocutory applications in that action. He also exhibits a number of further interlocutory orders made in the course of January 1976 in those proceedings. The evidence sworn in those proceedings does seem to show, inter alia, that Mr Conway and his associates had taken, inter alia, a number of patterns, garments and sketches from Petronius. It also seems to show that Mr Harris was a director of Eurexim Ltd, a major competitor of Petronius. It alleges in effect that the motives of Messrs Conway, Harris and Greenfield in obtaining these documents, so far from being those of safeguarding the interests of Petronius, were to render assistance to certain of its competitors.

There is obviously again an acute conflict of evidence between the plaintiffs and the defendants as to the events of January 1976 and as to the propriety or otherwise

*[*193]*

of the part which Mr Conway, Mr Harris and Mr Gerald Greenfield played in them. However, although there is a large volume of evidence relating to these events before me, I think it neither necessary nor appropriate to express even a prima facie view as to these issues, particularly in the absence of cross-examination of the deponents. The relevant point for present purposes is that these allegations and counter-allegations exist and there is clearly a triable issue both ways.

Also in January 1976, namely on 12 January, Conesto issued two writs. In the first action, to which Manwith, Mr Oppenheimer, WCN, Mr Long, Mr Reece and Mr Johnson were joined as defendants, it claimed a declaration that the purported transfer of all the shares in the capital of Petronius to Manwith pursuant to the share exchange agreement of 21 May 1973 was invalid and of no effect. By the second action, to which Mr Oppenheimer was joined as sole defendant, it claimed an account of all moneys or assets belonging to it coming into the hands of Mr Oppenheimer as a director, agent or employee of it.

In the event none of the three actions, which had been instituted in January 1976 and to which I have referred, were proceeded with for several months because negotiations took place which led to a conditional agreement for the sale of all the shares in Manwith (and thus effectively of its subsidiary Petronius) to a purchaser in Holland, wholly independent of the parties to the present action or to the other actions which I have mentioned. This agreement would have provided an overall settlement of the matters in dispute, but it was conditional on the obtaining of exchange control permission from the relevant Dutch authorities on or before 31 October 1976. This condition was never satisfied and no extension of that date was agreed, so that the agreement came to nothing.

Thereupon, according to the plaintiffs' evidence, the consortium decided to put Manwith into members' voluntary liquidation with a view to its assets being realised for the benefit of all its members and to pursuing against Mr Oppenheimer and his associated companies such remedies as Petronius or Manwith might have against them. On 18 November 1976 Messrs Johnson, Conway, Bick and Reece served on Manwith a requisition for the calling of an extraordinary general meeting for the purpose of considering a special resolution that Manwith should be would up voluntarily. This meeting has been convened.

Also on 18 November the plaintiffs made an attempt to inspect the statutory books, minute book and books of account of Petronius, and the plaintiffs (other than Mr Reece) made the like attempt in regard to the books of Manwith. These attempts, however, were largely unproductive. This led to an ex parte application by the plaintiffs to Goulding J, who, on 19 November, made an order for inspection. Attempts to enforce this order were again unsuccessful. The writ in the present proceedings and the notice of motion now before me were issued on 22 November by the plaintiffs. The first effective hearing of this motion took place on 23 November. On 24 November an order was made by Goulding J by consent,

ordering the defendants and each of them forthwith to cause to be delivered up on oath to Messrs Thornton Baker & Co, chartered accountants, all books of account, management accounts, working papers, bank statements, cheque stubs, contracts and invoices relating to any period after 21 May 1973 belonging to either of Petronius and Manwith to be held by Messrs Thornton Baker & Co pending the further hearing of the motion or until further order in the meantime, subject to and in accordance with the provisions set out in a schedule to the order, which related to safe custody and other matters. This order was, however, made expressly without prejudice to the defendants' right to argue at any time thereafter that the plaintiffs had no right to inspect or take copies of any one or more of the documents belonging to Petronius or Manwith and comprised in any of the categories of documents specified in the notice of motion. Voluminous evidence has been filed by the plaintiffs on the present motion designed to show that the defendants behaved unreasonably and improperly in regard to the events of November 1976. The defendants have likewise filed a large

*[\*194]*

amount of evidence designed to refute these assertions. Since, however, the present motion is not one to commit the defendants for contempt, and since the rights and wrongs of these events would be incapable of satisfactory determination in the absence of cross-examination, I propose to say no more about them. Meanwhile, on the 19 November 1976 board meetings of Petronius and Manwith had been convened by letters dated the previous day, 18 November. At the board meeting of Manwith, resolutions were purportedly passed to the following effect, namely (1) that, pursuant to art 17 of Manwith's articles of association, two additional ordinary directors of Manwith should be and were thereby appointed, namely Brian Long and Michael Galliver; (2) that Mr Conway and Mr Johnson should be and were thereby suspended from acting as directors of Manwith and that during such suspension Mr Conway and Mr Johnson should not be entitled to enter Manwith's premises, save for the purpose of attending duly convened board meetings, or to have access to any of the books, papers or other records of Manwith. At the meeting of the board of directors of Petronius, a resolution was purportedly passed to the effect that Mr Conway, Mr Johnson and Mr Reece should be and were thereby suspended from acting as directors of Petronius and that, during such suspension, they should not be entitled to enter its premises, save for the purpose of attending duly convened board meetings, or to have access to any of the books, papers or other records of Petronius.

Doubts arise as to the validity of these resolutions passed by Petronius and Manwith for a number of reasons including, inter alia, the short notice for the convening of the relevant meetings. Furthermore it is questionable what effect, if any, a resolution for the 'suspension' of a director can ever have in the absence of express powers in a company's articles of association to 'suspend', as opposed to 'remove', directors. The articles of association of Manwith and of Petronius contain no such express power. I do not however pursue these points, because the defendants have not for the purpose of this motion contended that these resolutions had the effect either of causing Mr Conway, Mr Johnson or Mr Reece, as the case might be, to cease to be directors of the companies with which they were concerned or of depriving them of any rights which they might otherwise have, in their capacities as such directors, to inspect the documents referred to in the notice of motion.

At a meeting of the directors of Petronius held on 24 November 1976 it was resolved to convene an extraordinary general meeting of that company to take place on 23 December. At a meeting of the directors of Manwith held on 25 November, it was resolved that Manwith should give notice to Petronius of its intention to propose resolutions for the removal of the plaintiffs from office as directors of Petronius at this extraordinary general meeting and such notice was duly given.

The present motion had a further hearing on 30 November, when it was adjourned until 17 December, on a continuation of the terms embodied in the order of 24 November. On 17 December the motion was stood over until 11 January 1977 on mutual undertakings to which I need not refer. On 11 January the present motion and WCN's motion in the proceedings between it and Mr James were both stood over to a

date to be fixed on various undertakings and cross-undertakings. The effect of these undertakings is, inter alia, that the proposed extraordinary general meetings of Manwith and of Petronius now stand adjourned to the fourth full working day after judgment on the effective hearing of both motions at first instance, the meeting of Petronius to be held before that of Manwith.

It will be convenient to deal first with the claim for the appointment of a receiver and manager of the assets of Petronius and of Manwith respectively. Counsel for the plaintiffs explained that the claims for this particular relief were included to cover the possible eventuality of my granting WCN interlocutory relief on its motion against Mr James and thus effectively precluding Mr James from exercising the voting rights in respect of his shares in Manwith until 1 November 1977. It is, I think, common ground that if and when, but only if and when, Mr James is free to exercise the

[*195]

voting rights in respect of these shares, Manwith will probably be put into voluntary liquidation so far as now can be foreseen. But counsel submitted that, if my decision on the other motion were such that, for practical purposes, no voluntary liquidation could be achieved until after 1 November 1977, it would be right to appoint a receiver and manager of the assets of Manwith and its subsidiary Petronius, substantially on the grounds that their assets would otherwise be in jeopardy during the interim period, particularly since the boards of directors of these two companies are in disarray.

In the event this particular issue no longer arises, because, as I have indicated, and for reasons which I will give in my judgment on the other motion, I have decided that it would not be right to enjoin Mr James from exercising the voting rights in respect of his shares in Manwith. In these circumstances it can, I think, reasonably be assumed that at the adjourned extraordinary general meeting of Manwith a resolution will probably be passed for its voluntary winding-up. The liquidator of Manwith, when appointed, will, by virtue of its controlling shareholding in Petronius, be in a position to take effective control of the management of the affairs and of the assets of Petronius. In these circumstances, as the plaintiffs themselves recognise, the appointment of a receiver and manager is not necessary in respect of either company, even assuming that their allegations of past misapplication of those companies' assets are justified.

The plaintiffs, however, still seek relief by way of an order for production and subsidiary relief as asked for by paras (1) and (2) of the notice of motion. Counsel for the plaintiffs, in opening, based his application on what he described as a broad ground and a more narrow ground. His broad ground was that the mutual confidence and trust which ought to subsist between persons in a joint venture is so palpably lacking in the present case that it is just and equitable that Petronius and Manwith and/or Manwith alone should be wound up, so that the liquidator can take the necessary steps so as to realise their or its assets to the best advantage and call any guilty parties to account. His more narrow ground was that the plaintiffs have an *absolute* right to inspect the books of the companies of which they are directors.

Counsel for the defendants, at an early stage of the hearing of the motion, indicated that the defendants would not and do not oppose in principle an order for the production of the documents of Manwith, of the nature sought in para (2) of the notice of motion, although they would have submissions to make in regard to the detailed form of any such order, for example, as to the persons against whom it should be made and as to the persons who should be allowed to inspect and take copies of such documents. He made it clear, however, that the defendants do on any footing seek to resist an order for production being made against Petronius.

Counsel for the defendants pointed out that, if the arrangements made between the parties in May 1973 are effective according to their terms, the plaintiffs have agreed that, so long as the common venture of Petronius continues, its management and control should be vested in Mr Oppenheimer through Manwith and that they can only determine such control by winding up Manwith, for which the votes of a 75 per cent majority of the shareholders in Manwith would be required. In these circumstances, in answer to what I have described as counsel for the plaintiffs' broad submission, he reminded me that this is not the

hearing of a petition for the compulsory winding-up of Manwith and should not be treated as if it were. On the hearing of any such petition, precise grounds would have to be formulated; there would have to be cross-examination in relation to the charges against Mr ●ppenheimer and his associates; and the court would have the opportunity and duty to investigate all the circumstances relied on as rendering it just and equitable that there should be a liquidation, including the wishes of the creditors and all other interested parties. Nor, he pointed out, is this an application by a minority shareholder seeking to make Mr Oppenheimer or his associates account for assets of either of the two companies allegedly misapplied. In these circumstances he submitted in effect that it would be quite wrong for the court, on this interlocutory motion, as a justification

[*196]

for making an order for production against Petronius, to make any assumption that there had been any misapplication of the assets of Petronius or of Manwith, as alleged, or that a petition for a compulsory winding-up order in respect of Manwith would be bound or even necessarily likely to succeed.

I accept these particular submissions of counsel for the defendants and accordingly do not accept the first broad ground, which the plaintiffs advanced for their application, which effectively asked the court to presuppose that a compulsory winding-up order could and would be made in respect of Manwith and Petronius or of Manwith alone.

By the like token, however, I am not prepared to assume in favour of the defendants, as they implicitly invite me to assume on their evidence, that the plaintiffs are concerned in a business or businesses which compete with Petronius and that their application for inspection is made in bad faith, not in the interests of Petronius, but really to enable the plaintiffs to destroy the business of Petronius so that they can pick up the relics. A large volume of evidence has been filed on behalf of the defendants designed to establish allegations of this nature and on the part of the plaintiffs designed to refute it. Once again, however, I think it neither necessary nor appropriate for the purpose of this interlocutory motion to form even a prima facie view as to whether these allegations are justified; and indeed as will appear from his written submissions to which I will refer in a moment, counsel for the defendants has not really invited me to do so. All he has invited me to do, in effect, is to accept that the defendants have a belief, not demonstrably unreasonable, that the plaintiffs are concerned in businesses which compete with that of Petronius and that it could be in the interests of the plaintiffs to destroy Petronius's business accordingly. I am prepared to approach this motion on this basis, just as I approach it on the basis that the plaintiffs' apparent belief that there has been misapplication of the assets of Petronius and/or Manwith by Mr Oppenheimer and his associates is not demonstrably unreasonable. There is again a triable issue both ways. In the result I view both the plaintiffs' stated reasons for desiring production of the relevant books of Petronius and the defendants' stated reasons for opposing such production with some caution.

As I have said, the adjourned extraordinary general meeting of Petronius is to be held immediately before the adjourned general meeting of Manwith. It therefore appears likely that the plaintiffs will in fact be removed from their offices as directors of Petronius at the earlier meeting and that this will all have occurred before the second meeting, at which the resolution for the voluntary liquidation of Manwith is likely to be passed. Counsel for the defendants pointed out that the plaintiffs' claim to inspect is based solely on their directorships of Petronius, that it is open to Petronius in general meeting to determine their right of inspection by removing them from office, and that the court has no power to impose on a company a director who has been effectively removed. Substantially, he submitted, the question for the court is whether it should interfere by way of mandatory injunction to compel Petronius to produce the documents referred to in para (1) of the notice of motion to the plaintiffs, notwithstanding that there is to be held within a very short time a general meeting of Petronius at which the plaintiffs are likely to be removed from office as directors at the behest of Manwith, the holder of all the shares in Petronius. Unless the court is satisfied that the plaintiffs have an absolute right to inspect (as counsel for the plaintiffs submitted in opening) and that the order must be made in all circumstances on a summary application,

Conway and others v Petronius Clothing Co Ltd and others [1978] 1 All ER 185

counsel for the defendants submitted that the answer to the question posed by him, on the particular circumstances of the present case, must be in the negative.

In the course of an able argument, counsel for the defendants supplied me with written propositions summarising his argument on the main issues as follows:

'(1) Section 147(3) of the Companies Act 1948 does not confer upon member, or upon a director, a civil right, enforceable by injunction, to compel the company

*[*197]*

or any directors of the company to make available its books of account for inspection by that director.

'(2) The right of a member of a company to compel the company to make available its books of account for inspection by a director is founded upon the company's articles of association: Regulation 124 in Table A of Schedule 1 to the Companies Act 1948 confers such a right.

'(3) The right of a director of a company to compel the company to make available its books of account for inspection by him arises, if at all, from the terms upon which he was appointed and agreed to act as such: in the absence of express terms it will be implied that the director was appointed upon the terms that he would be entitled to inspect the company's books of account as a necessary incident of his office.

'(4) The right of a director to inspect the company's books of account is of the same nature as his right to receive notice of, attend and take part in, meetings of the board of directors: both rights determine upon the removal of the director from office, and will not be specifically enforced against the company after such removal, notwithstanding any contractual term between the company and the director.

'(5) Where the company has taken steps to remove a director from office and a general meeting has been called for that purpose, the court will not specifically enforce against the company those rights of a director which are incidental to his office, but will refuse to interfere until the view of the general meeting is known: a fortiori if it is reasonably clear that the general meeting will decide to remove the director from office.'

Section 147 of the Companies Act 1948, so far as material for present purposes, provides as follows:

'(1) Every company shall cause to be kept proper books of account with respect to   *(a)* all sums of money received and expended by the company and the matters in respect of which the receipt and expenditure takes place; *(b)* all sales and purchases of goods by the company; *(c)* the assets and liabilities of the company …

'(3) The books of account shall be kept at the registered office of the company or at such other place as the directors think fit, and shall at all times be open to inspection by the directors …

'(4) If any person being a director of a company fails to take all reasonable steps to secure compliance by the company with the requirements of this section, or has by his own wilful act been the cause of any default by the company thereunder, he shall, in respect of each offence, be liable on summary conviction to imprisonment for a term not exceeding six months or to a fine not exceeding two hundred pounds … '

It was submitted on behalf of the plaintiffs that s 147 confers on directors a mandatory and unqualified statutory right to inspect the 'books of account' of a company, within the meaning of s 147(1). It is clear that for this purpose the expression 'proper books of account' is intended to have a wide meaning, because s 147(2) provides:

'For the purposes of the foregoing subsection, proper books of account shall not be deemed to be kept with respect to the matters aforesaid if there are not kept such books as are necessary to give a true and fair view of the state of the company's affairs and explain its transactions.'

There appears to be remarkably little authority relating to the question whether directors of a company have a right to inspect the books of a company, either by virtue of s 147 or at common law or on some other grounds. There can be no doubt that s 147 places a statutory obligation on a company to make its books of account

Conway and others v Petronius Clothing Co Ltd and others [1978] 1 All ER 185

*[\*198]*

open to inspection by the directors and that any director of a company who fails to take proper steps to secure compliance by the company with this duty is liable to criminal sanctions in accordance with s 147(4). It does not, however, necessarily follow that s 147(3) confers any civil right of action whatever on a director against a company which refuses him inspection. The answer to such a question whether a right is conferred 'must depend on a consideration of the whole Act and the circumstances, including the pre-existing law, in which it was enacted': see Cutler v Wandsworth Stadium Ltd ([1949] 1 All ER 544 at 548, [1949] AC 398 at 407), per Lord Simonds. The sanction of criminal proceedings, however, may tend to show that the statutory obligation is imposed for the public benefit and that the breach of it is intended to be a public wrong, not a private wrong giving rise to an action at the suit of an individual injured: per Lord Simonds ([1949] 1 All ER 544 at 548, [1949] AC 398 at 408). In the light of these principles I shall now trace briefly the history of the law relating to the right of directors to inspect the books of a company. In Burn v London and South Wales Coal Co and Risca Investment Co the plaintiff brought an action to obtain inspection of and take copies of documents belonging to a company of which he was a director, such documents being in the custody of the solicitor to the company. As it appears from the report, counsel on his behalf argued that 'a director, in order that he might properly perform his duties, had from the nature of the case a right to see all the documents under the control of his company'. As also appears from the report (7 TLR 118 at 118, 119):

> 'MR JUSTICE NORTH on the question whether a director has a right to see and take copies of documents belonging to his company, held that he had such right; and that he had such right not at meetings only. His Lordship pointed out the inconvenience that would arise if it were otherwise, from the delay and obstruction at meetings, and that the very object of a director's having access to such documents was that he might be prepared to act at meetings. In the course of the judgment, he observed that it was necessary that confidence should be reposed in a director that he would use his knowledge for the benefit of his company. And if a company had not confidence in their directors their course was to remove them.'

This was a judgment given in 1890. It would appear from the brief report that North J accepted the argument of the plaintiff's counsel, taking the view that a director had a right at common law to see and take copies of documents belonging to his company in order that he might properly perform his duties. At that time there was no question of his having any statutory right in this capacity.
Eighteen years later there was enacted the Companies (Consolidation) Act 1908. This contained a section, s 101, directing that a company's register of mortgages should be open at all reasonable times to the inspection of any creditor or member of the company without fee, and imposing sanctions, in the form of fines, against any officers of the company refusing inspection. Section 101(2) further provided that (among others) a judge of the High Court 'may by order compel an immediate inspection of the copies or register'. The body of the Act contained no similar provision in relation to inspection of the company's books of account by directors. However, in Sch 1 to the Act, there was set out table A, containing regulations for management of a company limited by shares, of which reg 103 provided as follows:

> 'The directors shall cause true accounts to be kept   of the sums of money received and expended by the company and the matter in respect of which such receipt and expenditure takes place, and of the assets and liabilities of the company.'

*[\*199]*

Regulation 104 provided:

> 'The books of account shall be kept at the registered office of the company, or at such other place or places as the directors think fit, and shall always be open to the inspection of the directors.'

After the 1908 Act there followed s 39 of the Companies Act 1928. Subsection (1) contained provisions obliging every company to cause to be kept proper books of account, in a form closely corresponding with reg 103 of table A in the 1908 Act, but on this occasion in the body of the Act itself. Section 39(2)

Conway and others v Petronius Clothing Co Ltd and others [1978] 1 All ER 185

contained a provision in the form of reg 104 of such table A with merely trivial amendments. Section 39(5) contained sanctions in the form of imprisonment or fines against directors who failed to take reasonable steps to secure compliance by a company with the requirements of sub-s (1) or sub-s (2) of the section.

The purpose of s 39 of the Companies Act 1928 was clearly to give teeth to the requirements of regs 103 and 104 of table A of the 1908 Act, by imposing criminal sanctions in the event of proper books of account not being kept and not being made open for inspection by the directors. I can, however, see no justification for reading the section as being intended to confer a statutory right of civil action on a director from whom inspection was withheld. Its wording was in significant contrast with that of s 27 of the same Act. Section 27(1) provided that the books containing the minutes of any general meeting of the company should be kept at the registered office of the company and should during business hours be open to the inspection of any member. Section 27(3) provided for fines against the company and its officers in the event of a refusal to allow inspection (or to provide copies on request) and concluded with the words:

'… and the court may by order compel an immediate inspection of the books in respect of all proceedings of general meetings or direct that the copies required shall be sent to the persons requiring them.'

The legislature, I have little doubt, thought it necessary or advisable expressly to empower the court to order an immediate inspection of the books because, but for the section, it would not have been clear that a member had any right to see them or that the court had the power to compel inspection. In contrast, I think that the legislature, in enacting s 39, presupposed, as was the case, that a director had a right at common law to inspect the books of his company and that accordingly it was not necessary to confer on directors a statutory right of inspection enforceable by civil action; all that was necessary was to provide for criminal sanctions in the event of proper books not being kept or not being made available for inspection to the directors.

Section 39(1)(2) and (5) of the Companies Act 1928 was incorporated, with small amendments in the latter case, in the Companies Act 1929, as s 122. The same matters were dealt with in an expanded form in ss 12, 13(8) and 20 of the Companies Act 1947 and were subsequently dealt with by s 147 of the Companies Act 1948.

It is in my judgment most significant that, as counsel for the defendants has pointed out, there are a number of provisions in the Companies Act 1948 which expressly empower the court to order an inspection. Section 87(5), for example, empowers it in certain circumstances to compel an immediate inspection of the register of debenture holders. Section 105(3) empowers it to compel an immediate inspection of the copies of instruments creating mortgages and charges or of a company's register of charges. Section 113(4) empowers the court to compel an immediate inspection of the register of members of a company and the index of their names. Finally, the section immediately preceding s 147, s 146, expressly empowers the court (by sub-s (4)) to compel an immediate inspection of minute books in respect of all proceedings of general meetings.

The wording of s 147 of the 1948 Act, in striking contrast to the four other sections

*[\*200]*

of the Act which I have just mentioned, contains no provision empowering the court to order any inspection. In these circumstances, this wording, viewed in its context and in the light of the preceding law, drives me to accept counsel for the defendants' submission that s 147(3) does not itself confer on directors of a company a statutory right, enforceable by injunction, to compel a company or any directors of a company to make available its books of account for inspection by that director. However, before I summarise my conclusions as to the nature of a director's rights of inspection, it will be convenient to refer to three other reported decisions which were referred to in argument.

In a judgment of the Supreme Court of New South Wales, Edman v Ross ((1922) 22 SR(NSW) 351 at 360) Street J said: 'A director's right to inspect and take copies of documents belonging to his company

Conway and others v Petronius Clothing Co Ltd and others [1978] 1 All ER 185

is, I think, clear.' He then referred to the judgment of North J in Burn v London and South Wales Coal Co and continued (22 SR(NSW) 351 at 361):

> 'The right to inspect documents and, if necessary, to take copies of them is essential to the proper performance of a director's duties, and, though I am not prepared to say that the Court might not restrain him in the exercise of this right if satisfied affirmatively that his intention was to abuse the confidence reposed in him and materially to injure the company, it is true nevertheless, that its exercise is, generally speaking, not a matter of discretion with the Court and that he cannot be called upon to furnish his reasons before being allowed to exercise it. In the absence of clear proof to the contrary the Court must assume that he will exercise it for the benefit of his company.'

In M'Cusker v M'Rae the Court of Session, on the petition of a director presented for the exercise of the nobile officium, made an order that the books of account of a company kept by it under s 147 of the 1948 Act should be made available for inspection by a director and a named chartered accountant on his behalf. It is, I think, implicit, from the report of the argument before it and from the relief given, that the court regarded the petitioner as having a statutory right of inspection. Since, however, no formal opinions were delivered by the court and since the argument of the respondent against the petition seems to have been directed to the question whether the right of inspection could be exercised by an agent rather than to the question whether the right existed at all, I think the case is of limited assistance for present purposes.
In Mutter v Eastern and Midlands Railway Co a shareholder and debenture stockholder in a company sought to exercise the right of inspection and perusal of the register of debenture stockholders given to shareholders and debenture stockholders by s 28 of the Companies Clauses Act 1863. The evidence showed that he had taken both the shares and the debenture stock at the instance of a rival company. The Court of Appeal, however, held that he was not on that ground debarred from insisting on his legal rights. As Lindley LJ said (38 Ch D 92 at 104):

> '… he is unquestionably in point of law both a shareholder and a debenture stockholder; he therefore has the rights, whatever they may be, of a shareholder and a debenture stockholder, and whether he is trustee for other people we cannot inquire.'

Counsel for the plaintiffs relied on this case by analogy in support of his contention that the motives of the plaintiffs in seeking production of the documents of Petronius

*[*201]*

are not relevant, because the plaintiffs' right of inspection is an absolute right. I think however there are two important points of distinction between *Mutter's* case and the present case. First, in that case the Court of Appeal plainly regarded s 28 of the Companies Clauses Act 1863 (which contained no express sanctions to cover the event of non-observance) as conferring a statutory right on a shareholder or debenture stockholder to inspect the register of debenture stockholders. Secondly, the right in question was one given to shareholders and debenture stockholders, who would not in any ordinary circumstances owe fiduciary duties to the company. In contrast the right under discussion in the present case is a right exercisable, if at all, by directors, who do owe fiduciary duties to their company.
With the limited assistance available from reported cases but with valuable help from counsel's arguments, I reach the following conclusions in relation to the nature of the right of a director to inspect the books of account of a company: (1) The right exists but it is a right conferred by the common law and not by statute. Although the legislature in s 147 of the 1948 Act (and its predecessors) implicitly recognised the existence of this right at common law, it conferred no new right: the purpose of that section and its predecessors was to impose criminal sanctions in the event of proper books of account not being kept or not being made available for inspection or in the event of a breach of any of the other duties imposed by the section. (2) The right of a director to see his company's books of account, which is exercisable both at and outside meetings, is conferred by the common law in order to enable the director to carry out his duties as a director (see Burn v London and South Wales Coal Co). I leave open the question whether this right conferred on him at common law is to be regarded on the one hand as a right

incident to his office and independent of contract or on the other hand as a right dependent on the express or implied terms of his contract of employment with the company, so that it may be excluded by express provision to the contrary; no such express provision to the contrary appears in the present case and counsel for the defendants accepts that the right at common law exists. (3) The right of a director to inspect the company's books of account must determine on removal of the director from office. (4) The right not being a statutory right, the court is left with a residue of discretion whether or not to order inspection. However, in the case where there is no reason to suppose that the director is about to be removed from office, the discretion to withhold an order for inspection will be very sparingly exercised. Although a director will not in general be called on to furnish his reasons before being allowed to exercise his right of inspection the court would in my judgment in such a case restrain him in the exercise of the right, if satisfied affirmatively that his intention was to abuse the confidence reposed in him as director and materially to injure the company. In my judgment, however, in the absence of clear proof to the contrary, the court would in such a case assume that he was exercising it for the benefit of his company. It will be seen that the proposition contained in this present paragraph is derived from the passage from Street J's judgment in Edman v Ross ((1922) 22 SR(NSW) 351 at 361) which has already been cited. This passage seems to me, if I may say so, consistent with both principle and common sense. If the position were otherwise, a director's rights of inspection could be rendered more or less nugatory, at least for many months, by specious allegations that he was exercising them with intent to injure the company or for other improper motives. (5) Principles rather different from those just stated in my judgment apply in a case, such as the present, where an interlocutory application for inspection is made to the court by a director who is alleged to have been misconducting himself as a director and, at the time when the application comes before the court, a general meeting of his company has been convened for the purpose of removing him from office. In such a case the court would, in my judgment,

[*202]

normally intervene to assist him on an interlocutory application for inspection, before the wishes of the company had been made known at the general meeting, only if it considered such intervention necessary for the protection of the company. The right of inspection is in my judgment one given to him to exercise for the benefit of the company. He can claim the right as a personal right only in the sense that he may invoke it so as to enable him to discharge his personal obligations to the company and his statutory obligations. If the evidence shows that at least some members of the company no longer have confidence in him as a director, because of alleged misconduct, and have indicated that lack of confidence by causing a general meeting to be convened for the purpose of his removal, the balance of convenience will, in my judgment, normally require postponement of the consideration of his interlocutory application for inspection until the meeting has been held (compare Harben v Phillips and Bainbridge v Smith). Each case, however, must depend on its special facts. In particular circumstances, the court may consider it essential for the protection of the company or indeed for the personal protection of the director that he be allowed to inspect the company's books even though a resolution for his removal as a director is shortly thereafter to be considered by the company's members.

On the present facts the balance of convenience in my judgment points against making an immediate order for inspection of the books of Petronius, before its general meeting has been held. As I have already indicated, I think there is at least a triable issue in regard to the defendants' assertion that the plaintiffs are interested as competitors of Petronius and that their motives for seeking inspection are to obtain information as actual or potential competitors of Petronius. I am far from saying that I think that these allegations would succeed at the trial; all I am saying is that I think there is a possibility that they might. If the allegations were well founded, it is possible that an immediate order for inspection could cause irremediable damage to Petronius and to the other defendants by virtue of their interests in Petronius or in Manwith. Mr Oppenheimer states in an affidavit that the information which could be derived from the books, accounts and records which the plaintiffs wish to inspect would include (i) information about the

pricing structure, profit margins and costs of Petronius; (ii) information about its allocation of expenditure and turnover to cover overheads; (iii) its policy in relation to credit given to customers; (iv) the sources of supply used by it. Mr ●ppenheimer states (and I have no difficulty in accepting) that this information would be of value to a competitor. It is thus on the cards that irremediable damage to Petronius and the defendant shareholders in Petronius could be caused by the inspection sought, even though the liquidation of Manwith took place as anticipated in the near future and even though the liquidator so appointed saw fit to place Petronius itself in liquidation. If, however, for some unexpected reason the liquidation of Manwith did not occur, or its liquidator, when appointed did not see fit to put Petronius into immediate liquidation, the damage could be greater.

In contrast, provided that arrangements are made for the safe custody of the documents of Petronius during the interim period, I cannot see that the plaintiffs will risk suffering any substantial damage of which they are entitled to complain, if I adjourn the present motion for a further hearing after the adjourned meetings of Petronius and of Manwith have been held. No difficulties arise in relation to Manwith because, as I have indicated, an order for inspection is no longer opposed in relation to that company. In relation to Petronius, if the liquidator of Manwith, when appointed, sees fit to place Petronius in voluntary liquidation, he should have no difficulty in procuring the making of a declaration of solvency by virtue of his control of the board of Petronius, so that no difficulty arises on this score. The other ground which counsel for the plaintiffs prayed in aid as a reason for making an immediate order for inspection

*[\*203]*

in respect of Petronius, as well as Manwith, was to preserve the relevant documents for the liquidator and to cover the eventuality of any other accidents, which might delay liquidation. However, I think that this anxiety on the plaintiffs' part can be simply dealt with by extending for the time being the provisions of Goulding J's order of 24 November 1976 under which the relevant documents rest with Messrs Thornton Baker & Co, until after the next hearing of the present motion.

In general it seems to me that it would be inappropriate to make an immediate order for an inspection of the books of Petronius before the outcome of the impending meetings of Petronius and of Manwith is known and, indeed, until after the liquidator of Manwith, if liquidation there is to be, has been in the saddle and has had a reasonable opportunity to consider what course should be adopted in relation to Petronius and its board. It cannot be regarded as an absolute certainty that the plaintiffs will cease to be directors of Petronius after the next general meeting of Petronius; still less can it be regarded as an absolute certainty that Manwith will be placed into liquidation at the next general meeting of that company. In default of compelling reasons for taking a contrary course, the status quo should in my judgment be preserved so far as possible until the outcome of those two meetings is known and until the liquidator of Manwith (if there is to be a liquidator) is in the saddle. If the present application for inspection, so far as it relates to Petronius, is adjourned until these various events have occurred, the court will then be in a position to deal with it with a fuller appreciation of the practical consequences of any order which it sees fit to make. Alternatively it is quite possible that during the interim period the question of inspection by the plaintiffs will have ceased to have any practical relevance.

In all the circumstances I propose to make an immediate order for inspection in relation to Manwith broadly on the lines of para (2) of the amended notice of motion, although I will hear counsel as to the precise form which such order should take. I propose to make no immediate order for inspection in relation to the books of Petronius as asked by para (1) of the notice of motion, but to adjourn that part of the motion relating to Petronius until a reasonable time after the proposed general meeting of Petronius and of Manwith have taken place. I propose to continue until the adjourned hearing the order of Goulding J of 24 November 1976, so far as it relates to the custody of the documents of Petronius. It may, I think, be convenient that the documents of Manwith should also continue to be held by Messrs Thornton Baker & Co pursuant to the terms of that order until the adjourned hearing of the motion.

Conway and others v Petronius Clothing Co Ltd and others [1978] 1 All ER 185

●rder accordingly.


Solicitors: *Franks, Charlesly & Co* (for the plaintiffs); *Clintons* (for the defendants).

*Jacqueline Metcalfe Barrister.*

**End of Document**